**Slip Op. 13-86**

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| FOSHAN NANHAI JIUJIANG QUAN LI SPRING HARDWARE FACTORY and FOSHAN YONGNUO IMPORT & EXPORT CO., LTD., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> LEGGETT & PLATT, INC., <br><br> Defendant-Intervenor. | **Before: Gregory W. Carman, Judge** <br><br> Court No. 12-00025 |

## OPINION AND ORDER

[Affirming determination to rescind new shipper review.]

Dated: July 1, 2013

Michael Scott Holton, Jeffrey S. Neeley, and Stephen William Brophy, Barnes, Richardson & Colburn, of Washington, DC, for Plaintiffs.

Douglas G. Edelschick, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, for Defendant. With him on the brief were Stuart F. Delery, Principal Deputy Assistant Attorney General, Jeanne E. Davidson, Director, and Franklin E. White, Jr., Assistant Director. Of counsel on the brief was Devin S. Sikes, Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce.

Yohai Baisburd and Forrest R. Hansen, White & Case LLP, of Washington, DC, for Defendant-Intervenor.

**Carman, Judge:**  Plaintiffs Foshan Nanhai Jiujiang Quan Li Spring Hardware Factory and Foshan Yongnuo Import & Export Co., Ltd. (collectively, "Plaintiffs" or "the Foshan companies") are producers of uncovered innerspring units from the People's Republic of China which are subject to antidumping duties.  Plaintiffs requested that the Department of Commerce ("Commerce" or "the government") conduct a new shipper review under section 751(a)(2)(B) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1675(a), and under 19 C.F.R. § 351.214(c).  New Shipper Review Request, Pls.' App'x Tab 1, CR 275, PR 276.[1]  At the conclusion of the administrative proceedings, Commerce determined that Plaintiffs' relevant sale of goods was not a <u>bona fide</u> commercial transaction and rescinded the new shipper review.  <u>Uncovered Innerspring Units From the People's Republic of China: Rescission of Antidumping Duty New Shipper Review</u>, 76 Fed. Reg. 80,337 (Dec. 23, 2011) ("Final Results") and accompanying Issues and Decision Memorandum (Pls.' App'x Tab 15, PR INT_046327 ("I&D Memo")).  Plaintiffs bring this suit under 28 U.S.C. § 1581(c) to challenge the Final Results, and have moved for judgment on the agency record pursuant to USCIT Rule 56.2.  After considering the administrative record and the arguments of the parties, the Court concludes that Commerce based its determination on substantial evidence in the record and did not act

---

[1] "CR" refers to the confidential administration record, and "PR" to the public administrative record.

contrary to law or in an arbitrary and capricious manner. The Final Results will therefore be upheld and Plaintiffs' motion will be denied. Judgement will issue for Defendant.

## BACKGROUND

Under certain circumstances, Commerce imposes antidumping duty orders ("ADD orders") on goods found to be imported into the United States at less than fair value. The duty imposed is designed to remedy unfair trade and level the economic playing field, rather than punish the dumping exporter. In setting the rate of the duties, Commerce generally establishes company-specific rates for exporters Commerce has been able to individually investigate, and establishes an estimated "all-others" rate which is applied to shipments originating with other exporters. The "all-others" rate is typically much higher than the rates imposed on individually-investigated companies. If a producer or exporter of subject merchandise did not export its goods to the United States during the period of investigation leading to the ADD order, and is not affiliated with a company that did so, the company that now exports subject merchandise to the United States may request that Commerce conduct a "new shipper review" to establish a company-specific individual ADD rate for its exports. Pursuant to statute and regulation, Commerce will investigate the details of the company's shipments to the

United States.  If Commerce determines from its investigation that the company's United States sales are not <u>bona fide</u> market transactions, Commerce will rescind the new shipper review and the "all-others" ADD rate will apply to the company's shipments to the U.S.

## I.     Plaintiffs Request and Receive a New Shipper Review

The ADD order was published in 2009.  <u>Uncovered Innerspring Units from the People's Republic of China: Notice of Antidumping Duty Order</u>, 74 Fed. Reg. 7,661 (Feb. 19, 2009).  Approximately one year later, the Foshan companies sold a shipment of subject merchandise to an unaffiliated U.S. importer.  Pls.' App'x Tab 8, CR 395 at 3 ("Preliminary Bona Fides Memo").  On August 20, 2010, Plaintiffs requested, and Commerce initiated, this new shipper review based on the sale.  <u>See</u> <u>Uncovered Innerspring Units From the People's Republic of China: Initiation of Antidumping Duty New Shipper Review</u>, 75 Fed. Reg. 62,107 (Oct. 7, 2010) ("Initiation Notice").

After initiation, the Foshan companies timely responded to several questionnaires from Commerce.  Mem. of Law in Supp. of Pls.' Mot. for J. on the Agency R. under USCIT R. 56.2 ("Pls.' Mem.") at 3.  The deadline imposed by 19 C.F.R. § 351.301(b)(4) for submitting new factual information into the record passed on January 18, 2011.  <u>Id.</u>  Thereafter, Commerce issued several supplemental questionnaires, and

the Foshan companies responded without Commerce indicating any deficiencies in those responses.  Id.  Plaintiffs provided information in these responses about the U.S. importer that purchased the sale forming the basis of the new shipper review, and Commerce used this information to examine the characteristics of the sale to determine whether it was a commercially reasonable transaction likely to be representative of Plaintiffs' future exports to the U.S.  Def.'s Resp. to Pls.' Mot. for J. upon the Agency R. ("Def.'s Opp.") at 3.

## II.    Commerce Rescinds the New Shipper Review

On August 4, 2011, the Department of Commerce published its preliminary determination to rescind the new shipper review because it found that the Foshan companies' U.S. sale was not a bona fide transaction.  Uncovered Innerspring Units From the People's Republic of China: Preliminary Intent To Rescind New Shipper Review, 76 Fed. Reg. 47,151 (Aug. 4, 2011) ("Preliminary Results").  In determining whether a company's sales are bona fide, Commerce weighs "the totality of circumstances," including "such factors as (a) [t]he timing of the sale, (b) the price and quantity, (c) the expenses arising from the transaction, (d) whether the goods were resold at a profit, and (e) whether the transaction was made on an arm's length basis." Id. at 47,152.

A. <u>Preliminary Results</u>

Commerce obtained data about sale of subject merchandise from U.S. Customs and Border Protection ("CBP data") for comparison when analyzing the commercial reasonableness of the Foshan companies' sale. Preliminary Bona Fides Memo at 4. Examining that data, Commerce determined that the quantity and price of U.S. sales during the period of review ("POR") were not normal and therefore "would not provide an adequate basis for comparison." <u>Id.</u> Consequently, Commerce chose to base its <u>bona fides</u> analysis on a comparison of Plaintiffs' "third-country sales data, as well as post-POR CBP data." <u>Id.</u> at 5.

Commerce's comparison showed that Plaintiffs' sale was of a quantity "88% smaller than [Plaintiffs'] average third-country sale" and smaller than any other single sale. <u>Id.</u> at 6. Plaintiffs' sale quantity was also "147% smaller than the average post-POR sale" in the CBP data. <u>Id.</u>

Commerce examined whether Plaintiffs' sale was typical of its business practices in part by considering whether innerspring importation represented an ongoing concern for the importer who purchased Plaintiffs' sale. <u>Id.</u> The importer indicated that it was an innersprings trading company that bought imported products from multiple suppliers and sold to many customers, with its purchase from Plaintiffs' being

"normal."  Id. at 7.  However, when later asked to provide details, the importer

eventually admitted that it had no other imports of innersprings during or after the

POR—which CBP data confirmed.  Id. (emphasis added).  Commerce also sought to

learn whether the importer actually sold the goods it bought from Plaintiff.  The

importer provided contradictory responses; initially, it stated that the innersprings were

"resold or used by mattress production companies," but later said they were used in its

own production.  Id. at 8.  Finally, the importer stated that the innersprings were used

by another company, but refused to provide corroborating records, citing

confidentiality concerns despite Commerce having provided a copy of its regulations on

keeping such materials private.  Id.

Commerce also examined the price of the Foshan companies' sale.  Id. at 9-10.

The average unit value ("AUV") of Plaintiffs' sale was "30% larger than the average

third-country similar model."  Id. at 10.  The sale also had a higher AUV than "all other

similar model third-country sales."  Id.  Commerce noted similar results when looking

at the post-POR CBP data: Plaintiffs' sale price was "134% higher" than the post-POR

average and also higher than all post-POR sales.  Id.

Noting that Plaintiffs' "single new shipper sale is the sole basis for calculating a

separate antidumping margin," Commerce emphasized that it is essential to ensure that

the transaction was an authentic sale.  Id.  Commerce, however, concluded that the sale was neither "reflective of normal business practices," nor "indicative of future selling practices," due to the atypical quantity and price of the sale, as well as the inconsistencies and deficiencies about what the importer did with the sale.  Id. at 10-11.

The Foshan companies filed a case brief challenging the Preliminary Results on September 13, 2011.  Pls.' App'x Tab 12, CR EXT_027114, PR EXT_027115 ("Pls.' Initial Case Brief").  Included in the case brief was new factual information the Foshan companies had obtained from the unaffiliated importer, which Plaintiffs believed could be submitted after the deadline because there was good cause and the information supplemented prior submissions by the importer.  Pls.' Mem. at 7.  Commerce, however, rejected the new information as untimely, and asked Plaintiffs' to resubmit the case brief with the new information redacted (which Plaintiffs did).  Id. (see Pls.' App'x Tab 14, CR EXT_028873, PR EXT_028875 ("Pls.' Redacted Case Brief")).

**B**.      **Final Results**

Commerce issued its rescission of the new shipper review on December 23, 2011.  Final Results, 76 Fed. Reg. at 80,337.

1.      Commerce's Analysis of Quantity of U.S. Sale

As to the issue of the quantity of Plaintiffs' U.S. sale, Commerce addressed the

arguments which Plaintiffs raised in their case brief. First, Commerce addressed

Plaintiffs' argument that the CBP data from the POR contains quantities comparable to

Plaintiffs' sale. Second, Commerce addressed Plaintiffs' argument that Commerce

arbitrarily decided the higher quantities in the post-POR CBP data were normal, instead

of deciding that those quantities were too high and the POR quantities were the normal

ones. Third, Commerce addressed Plaintiffs' argument that Commerce should not use

the post-POR data for its bona fide analysis because the Department did not obtain the

associated entry packets, did not explain why it selected the particular post-POR period

used, and did not place all of the data fields in the post-POR CBP data onto the record.

Finally, Commerce address Plaintiffs' argument that Plaintiffs' third-country sales,

analyzed on the basis of cost per unit rather than cost averaged over product weight,

show the U.S. sale to be bona fide. I&D Memo at 2; see generally Pls.' Redacted Case

Brief.

Commerce reiterated that the POR CBP data was unreliable, basing this

conclusion on the low number of entries, wide variations in the AUVs and values in the

POR data, and on the mixture of reporting on a unit value and a by-weight basis in the

POR entries. I&D Memo at 3. Commerce stated that it chose to use post-POR data

because that data tracked with Plaintiffs' POR third-country sales, convincing

Commerce that the POR CBP data (rather than the post-POR CBP data) was aberrational.  Id. at 4.  Commerce rejected Plaintiffs' contention that entry packets showed the sale under review to be of similar volume to the POR CBP data, noting that Plaintiff was relying on gross weights that included non-subject merchandise in them. Id.  As to its use of post-POR data, Commerce rejected the argument that it should have obtained full entry packets, noting that its normal practice is not to do so and that it only departed from this normal practice in this case in a limited manner in order to determine if there were errors in the POR CBP data and whether the POR entries could be converted into a per-unit basis.  Id. at 5.  Commerce also stated that it placed all of the relevant POR CBP fields of data used in its analysis on the record, and used a non-arbitrary period of the year following the POR in choosing the post-POR data (admitting there were only entries in certain months but defending as appropriate use of this time period.)  Id.  Commerce also indicated that it compared Plaintiffs' U.S. sale to the average total quantity of third-country sales because it could not conduct an analysis based on matching Harmonized Tariff Schedule of the United States ("HTSUS") numbers, as no record evidence indicated which HTSUS numbers would apply to the third-country sales.  Id. at 6.

        2.        Commerce's Analysis of Price of U.S. Sale

As to the issue of price, Commerce addressed Plaintiffs' arguments (a) that the

U.S. sale was in range with the third-country sales on a per-unit basis; (b) that

Commerce's use of per-weigh valuation rather than per-unit valuation was arbitrary

and contrary to the record; and (c) that even on a per-weight basis, its U.S. sale model

was most similar to a comparably-priced third-country model, and steel prices spiked

during the POR, making Plaintiffs' price bona fide.  Id. at 7.

Commerce indicated that it agreed that a unit-based cost analysis would be most

appropriate where possible, but Commerce stated that "we note that regardless of the

comparison data set, [Plaintiffs'] third-country sales or post-POR data, the results of the

bona fides analysis are identical, i.e., the price of the sale under review is high relative to

other sales."  Id. at 8.  Commerce thus found the U.S. sale price to be high even when

relying on a per unit price comparison to Plaintiffs' third-country sales.  Id. Commerce

rejected Plaintiffs' suggestion that Commerce should compare its U.S. sale to a single

sale by Defendant-Intervenor, since there was a dearth of data about it on the record.

Id. at 8-9.  Commerce also rejected Plaintiffs' argument that it should compare the U.S.

sale to sales of all models in third-countries, rather than only to third-country sales of

the most similar model.  Id. at 9.  Commerce found that this would not provide an

apples-to-apples comparison because it would not be based on similar merchandise.  Id.

> 3.      Commerce's Analysis of Disposition of U.S. Sale

As to the disposition of the U.S. sale, Commerce rejected Plaintiffs' arguments

(a) that the importer stated clearly that the merchandise was sold to its affiliate, which

manufactured it into mattresses; (b) that Commerce should have requested an

explanation if it needed clarification of the importer's conflicting or inconsistent

responses; (c) that the importer only said it had consumed the merchandise because it

was referring to itself and its affiliated company together, and the affiliate had

consumed the merchandise; and (d) that Commerce falsely assumed the importer and

its affiliate generated internal documentation that would corroborate their statements to

Commerce.  Id. at 9-10.

Commerce noted again the inconsistencies in the multiple responses of the

importer as to what it does with purchased innersprings, and rejected Plaintiffs'

"improbable post-hoc explanation that its importer transfers innersprings between

affiliated companies, further manufactures innersprings into mattresses, and sells the

resulting mattresses, all without keeping any form of written record of these activities."

Id. at 10.  Commerce continued to find that there was "no clear evidence that the

merchandise under review was consumed or sold," and thus no evidence that the sale

was <u>bona fide</u>.  <u>Id.</u> at 11.  Commerce also noted that it was Plaintiffs' obligation to complete the administrative record, and not Commerce's obligation to request an explanation for conflicting responses by the importer.  <u>Id.</u> at 11.

    4.    <u>Commerce's Analysis of Importer's Ongoing Business Interest</u>

As to whether innersprings were an ongoing concern for the importer, Commerce considered Plaintiffs' arguments (a) that Commerce incorrectly conflated the importer's lack of "imports" of innersprings with a lack of "purchases" of innersprings; and (b) that Commerce failed to develop a record of the importer, which would have shown it and its affiliates to be a well-established group of companies engaged in the consumption of innersprings and the manufacturing of mattresses.  <u>Id.</u>

Commerce, however, noted that it had requested detailed information on the importer's "purchases" and ongoing commercial operations, but that the importer had not provided any timely information about other innerspring purchases.  <u>Id.</u> at 12.[2]

    5.    <u>Conclusion of Final Results</u>

Based on all of these considerations, Commerce continued to find in the Final Results that the administrative record did not show that Plaintiffs' U.S. sale was a <u>bona</u>

---

[2] Commerce noted that the importer finally provided information about other purchases of innersprings with Plaintiffs' case brief, but the information was properly rejected by Commerce as untimely.  I&D Memo at 12 n.55.

<u>fide</u> commercial transaction and determined that the new shipper review would be rescinded.  <u>Id.</u> at 13; <u>see also</u> Final Results.

<b>STANDARD OF REVIEW</b>

In hearing a challenge to a decision by Commerce to rescind a new shipper review, "[t]he court shall hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i).

<b>DISCUSSION</b>

## I.      Legal Framework of Commerce's Determination

In a new shipper review, Commerce examines the U.S. sales of a new exporter to determine whether that company is entitled to its own antidumping duty margin under an antidumping order, and if the company is entitled to a separate rate, to determine what the rate should be.  <u>See</u> 19 C.F.R. § 351.214(b)(2); <u>Hebei New Donghua Amino Acid Co., Ltd. v. United States</u>, 29 CIT 603, 604, 374 F. Supp. 2d 1333, 1335 (2005) ("<u>Hebei</u>").  To determine entitlement to an individualized rate, Commerce's practice is to determine whether the proposed new shippers have conducted <u>bona fide</u>, commercially reasonable transactions that are indicative of how the company can be expected to act in the future.  <u>Hebei</u>, 374 F. Supp. 2d at 1338; <u>Tianjin Tiancheng Pharm.</u>

Co. Ltd. v. United States, 29 CIT 256, 259, 366 F. Supp. 2d 1246, 1249-50 (2005)

("Tianjin"). "In evaluating whether or not a sale is 'commercially reasonable,'

Commerce has considered the following factors, among others: (1) the timing of the

sale, (2) the price and quantity[,] (3) the expenses arising from the transaction, (4)

whether the goods were resold at a profit, (5) and whether the transaction was at an

arm's length basis." Hebei, 374 F. Supp. 2d at 1339 (citations omitted). This Court "has,

on a number of occasions, upheld Commerce's use of this analysis." Shandong Chenhe

Int'l Trading Co., Ltd. v. United States, 34 CIT ___, 2010 WL 4924016 at *2 (2010) (citing

Hebei, Tianjin, and Windmill Int'l Pte., Ltd. v. United States, 26 CIT 221, 193 F. Supp. 2d

1303 (2002)).

## II.    Plaintiffs' Challenges to the Final Results

Plaintiffs challenge the Final Results on several grounds. First, Plaintiffs contend

that the Commerce "concealed its adverse facts available [("AFA")] decision and failed

to meet its statutory obligations by not disclosing to parties their failure to respond or

otherwise cooperate." Pls.' Mem. at 10. Plaintiffs contend such a result is "troubling"

because Plaintiffs were never notified of any failure to cooperate, as required by statute

before AFA can be applied, and because any such finding "would have to be based on

the unaffiliated importer's responses" rather than a failure by Plaintiffs. Id. at 10-11.

Next, Plaintiffs claim that the evidence on the record fails to support Commerce's

decision that the quantity and selling price of Plaintiffs' sale were not commercially

reasonable since many bona fide sales on the record were similar to the U.S. sale under

review.  Id. at 11.  Plaintiffs also challenge Commerce's conclusion that the importer

provided conflicting information, claiming it to be unsupported in the record.  Id.

Finally, Plaintiffs contend that Commerce's rejection of the new factual information

submitted by the importer along with Plaintiffs' case brief was an abuse of discretion

since the information that corrected and clarified the record that had already been

established.  Id.

III.    **The Final Results Are Supported by Substantial Evidence and Otherwise in Accordance with Law**

   A.       **Plaintiffs Failed to Administratively Exhaust Their AFA Claim**

   The Court "shall, where appropriate, require the exhaustion of administrative

remedies."  28 U.S.C. § 2637(d).  The Court construes this requirement strictly in order

to avoid intruding on the authority of Commerce by making decisions that are properly

for the agency to carry out.  See Corus Staal BV v. United States, 502 F.3d 1370, 1379

(Fed. Cir. 2007); Rhone Poulenc, Inc. v. United States, 13 CIT 218, 226, 710 F. Supp. 341,

348 (1989).  After examining the record and the briefs before the Court, it is clear that

Plaintiffs failed to raise a claim in the administrative proceeding that Commerce's bona

fide analysis of the importer was tantamount to making an AFA finding without complying with the requirements of 19 U.S.C. § 1677e.  The first determination as to whether this argument has merit, or is merely argle-bargle, is a determination entrusted by Congress to the Department of Commerce, and the Court will refrain from considering it.[3]

**B.      Substantial Evidence Supports Commerce's Bona Fide Determination**

Commerce properly determined that the totality of the circumstances evidenced in the administrative record supported a finding that the Foshan companies' U.S. sale was not bona fide.  The Court therefore affirms that finding.

**1.      Quantity**

Plaintiffs challenge Commerce's finding that the quantity of the U.S. sale under review deviated below the quantity of other sales of the subject merchandise.  Plaintiffs' issue is really that Commerce based "its bona fides analysis on the average quantities rather than the actual quantities of other commercial sales reported on the record."  Pls.' Mem. at 19.  But as Defendant points out, this Court has upheld Commerce's use of averages in situations calling for them.  Def.'s Opp. at 18.  Here, Commerce chose to

---

[3] For this reason the Court also does not address the merits of Commerce's counterargument, which is that Commerce made no AFA determination because, in the absence of even a single bona fide sale, it was unable to advance to that stage of the new shipper review.  See Def.'s Opp. at 12.

average because, as it explained in its <u>bona fides</u> memo, its past practice was to do so

when it could not disaggregate data, and also because the record here did not indicate

which HTSUS number would apply to the third-country sales under consideration and

therefore a comparison on an individual basis could not be relied upon.  <u>Id.</u> at 18-19

(citing Preliminary Bona Fides Memo at 4).  Because the Court finds that Commerce's

approach to quantity was explained on the basis of the particular administrative record

before the agency and was a reasonable exercise of Commerce's discretion in

conducting a new shipper review, the Court affirms the quantity portion of the Final

Results.

> 2.      <u>Price</u>

Plaintiffs contend that Commerce acted outside the record evidence when it

chose to compare post-POR CBP entries of subject merchandise with the average unit

value by weight of Plaintiffs' sales of a similar unit in third countries.  Pls.' Mem. at 21.

Plaintiffs also argue that Commerce failed to take account of evidence of the effect on

price of "changes in raw material costs and other unique production issues," <u>id.</u> at 21,

and ignored certain pricing data submitted by Defendant-Intervenor, <u>id.</u> at 23-24.  The

problem with these arguments is that they are belied by the record.  Commerce, in fact,

explained that the post-POR CBP data was reported only on the basis of weight, and

explained that Commerce consequently had to convert all of the data to a weight basis in order to make comparisons with the post-POR CBP data. Def.'s Mem. at 21. Also, Commerce explained that this was a secondary price comparison that supplemented its primary third-country unit-based price analysis. Id. Both comparisons, Commerce determined, show that the price of the U.S. sale under review was high. Commerce also addressed Plaintiffs' concerns about the way Commerce used third-country pricing data, noting that it was unable to conduct the ideal analysis it would have like to conduct because the record lacked evidence about the HTSUS number of third-country sales. Id. at 21-22. Finally, Commerce found in the Final Results that Defendant-Intervenor's sale lacked sufficient information to be reliable as a comparison. Id. at 22. The Court finds that Commerce adequately responded to all of Plaintiffs' arguments in reasonable ways and based its determination as to price on a reasonable handling of the record evidence before the agency. The Court therefore affirms the price portion of the Final Results.

### 3. The Importer's Disposition of the U.S. Sale Merchandise

Plaintiffs' challenge to Commerce's finding that the importer gave inconsistent and conflicting information boils down to contending that if Commerce found the information "incomplete," Commerce should have tried to clarify the information on its

own initiative.  Pls.' Mem. at 25-26.  This argument is unavailing and rests on Plaintiffs'

desire for Commerce to, in essence, give the importer the benefit of the doubt.

But doubt is exactly what the importer's responses raise.  Commerce asked the

importer to identify the customer that bought the merchandise in the U.S. sale under

review, and the importer replied, vaguely, that the innersprings at issue "were resold or

used in mattress companies," including one named company (which is affiliated with

the importer).  Def.'s Opp. at 23.  That response did not provide a clear answer to

Commerce's question.  Commerce then asked for documents demonstrating that each

innerspring unit in the U.S. shipment was sold, and included instructions on how the

importer could submit those records under an APO.  Id.  But the importer did not

document the resale of the merchandise, instead telling Commerce that it was "used for

our own production."  Id. at 23-24.  So Commerce then asked the importer to document

the consumption of the goods, but, again, the importer declined to do so, now stating

that a different entity, not the importer, had consumed the goods in production (a

statement it also did not support with any documents).  Id. at 24.  Faced with such

varied responses, and the importer's failure to provide supporting documents, the

Court finds that Commerce acted reasonably in concluding that the U.S. sale under

review was not typical for the importer.  That conclusion is certainly supported by the

record evidence, and so the Court affirms Commerce on this question.

4.        The Importer's Ongoing Interest in Innersprings

In its initial response to Commerce, the importer claimed that it was a regular purchaser of innersprings with many suppliers, and that it regularly found new suppliers such as Plaintiffs to supply it with large numbers of various sizes of innersprings of high quality. However, the importer refused to identify its suppliers, and indicated that it did not buy any other imports of innersprings after the beginning of the POR. Id. at 25-26. The importer also declined to document its other purchases. Id. at 26. Faced with responses of this variety, Commerce reasonably determined that it could not tell whether the importer had an ongoing interest in innersprings and therefore found the importer's purchase of the subject sale not to be an ordinary commercial transaction for the importer. Regardless of Plaintiffs' disagreement, Commerce made a permissible, reasonable determination based on the evidence before it when it determined that the importer had no ongoing interest in the subject merchandise. The Court therefore affirms that aspect of the Final Results.

5.        Commerce Acted Properly in Rejecting New Factual Information

The Courts have held that Commerce abuses its discretion if it rejects newly submitted factual information under certain circumstances. Plaintiffs contend such

circumstances were present here because the new information submitted with its Non-redacted Case Brief merely clarified or supplemented information already on the record.  Defendant correctly notes, however, that the new factual material submitted by the importer with Plaintiffs' case brief attempted to introduce information that the importer had previously declined to supply despite having an opportunity to do so.  Def.'s Opp. at 34-35.  Additionally, Commerce retains the discretion to extend its regulatory new factual information deadline for good cause.  But as Defendant points out, no good cause was shown here and no request for an extension of time was filed.  In such circumstances, the Court finds that Commerce did not abuse its discretion in enforcing its deadline and rejecting the new factual information in Plaintiffs' Non-redacted Case Brief.

CONCLUSION

The Court has considered Plaintiffs' remaining arguments and found them to be without merit.  As a result of the considerations detailed above, the Court holds that Commerce based the Final Results on substantial evidence on the administrative record and acted in accordance with law.  Consequently, it is hereby

**ORDERED** that Uncovered Innerspring Units From the People's Republic of China: Rescission of Antidumping Duty New Shipper Review, 76 Fed. Reg. 80,337 (Dec.

23, 2011) is sustained; and it is

ORDERED that Plaintiffs' motion for judgment on the agency record is denied;

and it is furthermore

ORDERED that judgment shall issue for the United States.

<u>      /s/Gregory W. Carman      </u>
Gregory W. Carman, Judge

Dated: July 1, 2013
New York, New York